## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOPHIA CALLIHAM,<br><br>        Plaintiff,<br><br>v.<br><br>PREVENTIVE MEASURES OF<br>WASHINGTON, DC, LLC, *et al.*,<br><br>        Defendants. | Case No. 23-cv-638-TJK-MJS |

## REPORT AND RECOMMENDATION

Plaintiff Sophia Calliham ("Calliham") was terminated from her employment with Amazing Love Health Services, LLC ("Amazing Love") after she reportedly raised concerns to management about fraudulent billing practices and kickbacks. She then filed this case alleging retaliatory discharge under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), against Amazing Love, its principal owner Georges Ntemi ("Ntemi"), and others. Neither Amazing Love nor Ntemi appeared to defend against the suit, so the Clerk entered default against both. Calliham now moves for default judgment. The motion is referred to the undersigned for a report and recommendation. For the reasons below, the undersigned recommends that the Court **GRANT** the motion in substantial part and enter default judgment in favor of Calliham and against Amazing Love.

## FACTUAL BACKGROUND[1]

Calliham joined Amazing Love as a Quality Improvement Specialist in April 2019. (*See* ECF No. 1 ("Compl.") ¶ 10.) Her duties included, among other things, "randomly reviewing

---

[1] These facts are drawn from the Complaint's allegations, which the Court accepts as true by virtue of the defendants being in default. *See Crabtree v. Buffalo Grand Hotel Inc.*, 2024 WL 2864222, at *3 (D.D.C. June 6, 2024) (citing *Fanning v. AMF Mechanical Corp.*, 326 F.R.D. 11, 14 (D.D.C. 2018)).

consumer charts to ensure Amazing Love complied with D.C. law and regulations." (*Id*. ¶ 11.) Through her work, Calliham "realized that Amazing Love was billing Medicaid for Community Support Worker (CSW) visits that had not occurred" and "using billing codes that reflected more expensive services than those actually provided." (*Id*. ¶¶ 12–14.) She separately discovered that it was paying customers to sign up for services, which she calls a "kickback scheme." (*Id*. ¶ 16.)

Calliham raised these concerns internally with her first-line supervisor at Amazing Love, who in turn conveyed them to the company's former CEO. (*See id*. ¶¶ 17–19, 21.) According to Calliham, her supervisor likewise communicated Calliham's concerns to Ntemi after he became CEO, as well as to Amazing Love's COO. (*Id.* ¶ 20.) Neither took any steps to address the problems, however. (*Id.*) In fact, Calliham says Ntemi and the COO continued to impose standards that "were nearly impossible" to meet, which necessitated the "fraud." (*Id*. ¶¶ 20, 23.) Calliham also reported her concerns about these issues to her program director, who reportedly responded by acknowledging the importance of avoiding fraudulent practices. (*Id.* ¶¶ 21–22.)

On March 13, 2020, Calliham was called to a meeting with an Amazing Love manager, "Ms. Tembunde," and a human resources representative. (*Id.* ¶ 25.) During this meeting, Tembunde asked Calliham, "What do you have against the company?" (*Id.* ¶ 26.) Tembunde likewise told Calliham, "Every time I come to the office, I hear your name in something causing trouble for the agency." (*Id.*) Tembunde accused Calliham of "encourag[ing] staff members and consumers to file grievances." (*Id.* ¶ 27.) At the end of the meeting, Tembunde fired Calliham, ostensibly on the basis that she was "creating discord in the workplace." (*Id.* ¶ 28.)[2]

---

[2] When Amazing Love later fought Calliham's claim for unemployment benefits, it defended its decision on different grounds by claiming she was "terminated for a conflict of interest." (Compl. ¶ 29.)

## PROCEDURAL HISTORY

Calliham filed her one-count complaint on March 8, 2023. Along with Amazing Love and Ntemi, she originally named two other defendants: Preventive Measures of Washington, DC, LLC and Dwayne Jones. The complaint alleged, on information and belief, that "Amazing Love was acquired by Preventative Measures" and that Jones was the "principal owner and operator of Preventative Measures." (Compl. ¶¶ 8–9.) Not long after filing, though, Calliham voluntarily dismissed Preventative Measures and Jones from the case (*see* ECF No. 5; May 1, 2023 Min. Order), leaving only Amazing Love and Ntemi as defendants from that point forward.

Following service, neither Amazing Love nor Ntemi answered or otherwise appeared to defend against the case. So Calliham attempted to move for default judgment. That request was denied without prejudice because Calliham had not completed the predicate step of securing entry of default against the defendants in keeping with Federal Rule of Civil Procedure 55(a). (*See* ECF No. 8; Aug. 1, 2023 Min. Order.) Calliham then requested—and the Clerk of Court processed—entry of default against Amazing Love and Ntemi. (ECF Nos. 10, 12–14.) At that point, Calliham renewed her motion for default judgment, but it was again denied without prejudice, this time because she "provided no evidentiary support for the damages requested in the motion." (ECF No. 15; Oct. 6, 2023 Min. Order.) Proving the adage that the third time is a charm, Calliham tried once more, filing the motion for default judgment presently before the Court. (ECF No. 17.)

As indicated, the motion is referred to the undersigned for a report and recommendation. The Court held an evidentiary hearing on December 16, 2024, during which Calliham testified and presented other evidentiary submissions, and the Court also received several supplemental filings from Calliham, both before and after the hearing. (ECF Nos. 23, 24, 28.)

**DISCUSSION**

I.    **Legal Standards**

Default judgment is governed by Federal Rule of Civil Procedure 55, which prescribes a two-step process to secure "a judgment for affirmative relief" against a party that "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). First, the plaintiff must request that the clerk "enter the party's default." *Id.* Second, and only after default is entered, the plaintiff must seek a default judgment. Fed. R. Civ. P. 55(b). "By providing for a two-step process, Rule 55 allows the defendant the opportunity to move the court to set aside the default before the court enters default judgment." *Fanning v. AMF Mechanical Corp.*, 326 F.R.D. 11, 13–14 (D.D.C. 2018) (citation and quotation marks omitted).

Entry of default, at the first step, "'establishes the defaulting party's liability for the well-pleaded allegations of the complaint.'" *Id.* (quoting *Boland v. Elite Terrazzo Flooring, Inc.,* 763 F. Supp. 2d 64, 67 (D.D.C. 2011)). But the court must still determine, at the second step, whether the unchallenged factual allegations—accepted as true—establish liability. *CapitalKeys, LLC v. Democratic Republic of Congo*, 278 F. Supp. 3d 265, 285 (D.D.C. 2017).

Assuming liability is found as a general matter, that still "does not automatically establish liability in the amount claimed by the plaintiff." *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 12 (D.D.C. 2013). The court must instead "'make an independent determination of the sum to be awarded.'" *Fanning*, 326 F.R.D. at 13–14 (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002)). The court exercises "considerable latitude" in making that determination, and the plaintiff retains the burden of proving damages "to a reasonable certainty." *Elite Terrazo Flooring*, 763 F. Supp. 2d at 67–68. To that end, the plaintiff may rely on "affidavits or documentary evidence" and is "entitled to all reasonable inferences from

the evidence" offered. *Fanning*, 326 F.R.D. at 14. The court may also elect to hold an evidentiary hearing to determine damages, Fed. R. Civ. P. 55(b)(2), but it is not required to do so.

## II.    Default Judgment Is Improper Against Georges Ntemi

The Court begins by dispensing with Calliham's request for default judgment against Ntemi. During the hearing, the Court asked counsel about D.C. Circuit precedent that seems to preclude liability on an FCA retaliation claim against Ntemi as an individual defendant. *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 322 F.3d 738, 740–41 (D.C. Cir. 2003) (holding that Section 3730(h) retaliation claims are only proper against an "employer," but not an individual owner or director); *see also Saunders v. Dist. of Columbia*, 789 F. Supp. 2d 48, 56 (D.D.C. 2011) (relying on *Siewick* for proposition that "there is no individual liability" under Section 3730(h)). In response—and without any real pushback—Calliham's counsel conceded the point and withdrew the request for default judgment against Ntemi. The undersigned therefore recommends that the Court **DENY AS WITHDRAWN** this aspect of Calliham's motion.[3]

## III.    Default Judgment Should Be Granted Against Amazing Love

Turning to Calliham's request for default judgment against Amazing Love, the undersigned believes Calliham's motion should be granted, albeit in a lesser amount than Calliham seeks. The Court walks through the necessary analysis in the sections that follow.

### A.    Plaintiff Properly Served Amazing Love

The Court starts by evaluating whether Calliham has demonstrated proper service of process on Amazing Love. After all, "a default judgment cannot be issued where the requirements of proper service have not been satisfied." *Portillo v. Smith Commons DC, LLC*, 2021 WL

---

[3] Given this development, it is somewhat surprising that Ntemi even remains a named defendant at this point. Given Calliham's counsel's apparent agreement that Ntemi cannot be found individually liable under Section 3730(h)—which is the only claim Calliham asserts—the undersigned encourages counsel to effectuate his dismissal. If not, the Court should consider an order to show cause on the subject.

3287741, at *2 (D.D.C. Aug. 2, 2021); *SNH Med. Off. Properties Tr. v. A Bloomin' Sandwich Cafe, Inc.*, 2020 WL 5834858, at *5 (D.D.C. Sept. 30, 2020) (similar).

The Federal Rules of Civil Procedure generally allow for service of process on a business entity by delivery of "a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process[.]" Fed. R. Civ. P. 4(h)(1)(B). Alternatively, District law authorizes service of process through the Mayor or her designee "[i]f an entity fails to designate or maintain a registered agent in the District," or if the entity's registered agent "cannot with reasonable diligence be found." D.C. Code § 29-104.12; *see* Fed. R. Civ. P. 4(h)(1)(A) (authorizing service "in the manner prescribed by Rule 4(e)(1) for serving an individual"); *see* Fed. R. Civ. P. 4(e)(1) (authorizing service by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made"); *Robinson v. Ergo Solutions, LLC*, 10 F. Supp. 3d 157, 161–62 (D.D.C. 2014) (finding proper service under this alternative method); *SNH Med. Off. Properties Tr.*, 2020 WL 5834858, at *5 (same).

In serving Amazing Love, Calliham relied on the alternative methodology authorized by D.C. Code § 29-104.12(d). On initial review, the Court did not believe the original affidavit of service (ECF No. 6) satisfied the statute's requirements because it was silent as to whether Amazing Love failed to maintain a registered agent in D.C., or whether Calliham had been unable to serve its registered agent despite "reasonable diligence." The Court requested supplemental briefing on that issue, which Calliham recently filed. (Jan. 10, 2025 Min. Order; ECF No. 28.) Therein, Calliham demonstrated that Amazing Love's registered agent was Georges Ntemi; Calliham likewise established—through process-server affidavits—that she was unable to personally serve Ntemi despite diligent efforts. (ECF Nos. 28-1, 28-3, 28-5.) Those efforts

included four separate attempts on four different days at the 15th Street SE address for Amazing Love reflected in the District's records, plus three additional attempts on three different days at another address in Bowie, Maryland associated with Ntemi. This showing falls well within the range of efforts that other cases in this District have deemed sufficient to reflect "reasonable diligence" for these purposes. *D&E Sec. & Logistics, LLC v. 650 Lamont BL LLC*, 2023 WL 10553625, at *1 (D.D.C. July 28, 2023) (describing "five unsuccessful attempts to effect service" on a registered agent before serving the Mayor's designee); *SNH Med. Off. Properties Tr.*, 2020 WL 5834858, at *5 (similar); *Robinson*, 10 F. Supp. 3d at 162 (similar).[4]

Finally, Calliham offers another sworn process-server affidavit that establishes personal delivery of a copy of the summons and complaint for Amazing Love to the D.C. Superintendent of Corporations on April 28, 2023. (ECF Nos. 6, 28-6.) The Superintendent is designated to accept service on the Mayor's behalf for these purposes. *See, e.g.*, *D&E Sec. & Logistics*, 2023 WL 10553625, at *1; *SNH Med. Off. Properties Tr.*, 2020 WL 5834858, at *5 (same) (citing 56 D.C. Reg. 6804). As other cases have recognized, once Calliham served the Superintendent of Corporations as demonstrated in the affidavit, "'service was complete,' notwithstanding [the agency's] independent statutory duty to attempt service on" Amazing Love from there. *SNH Med. Off. Properties Tr.*, 2020 WL 5834858, at *5 (quoting *Robinson*, 10 F. Supp. 3d at 163–64).[5]

---

[4] At first blush, the record seems to reflect an inconsistency regarding Calliham's ability to serve Ntemi because she claims to have accomplished service on Ntemi with respect to the claim against him. (ECF No. 7.) But the affidavit as to Ntemi reflects substitute service—*i.e.*, by "leaving a copy of [the summons and complaint] at the individual's dwelling or unusual place of abode with someone of suitable age and discretion who resides there," Fed. R. Civ. P. 4(e)(2)(B)—which cannot be used to accomplish service on a registered agent of a business entity. In other words, Calliham was never able to *personally* serve Ntemi, whether in his individual capacity or his capacity as the registered agent of Amazing Love.

[5] The undersigned observes that at least one case in this District has demanded that plaintiffs satisfy an additional step to establish proper service under D.C. Code § 29-104.12(d), by requiring that they request and file a "certificate of service" from the Superintendent of Corporations following the agency's mailing. *See, e.g.*, *Moreland v. 1010 V LLC*, 2025 WL 561333, at *4 (D.D.C. Feb. 20, 2025) (denying default judgment on this basis). But in the undersigned's view, this additional step—while perhaps a good idea as

The undersigned finds that Calliham has demonstrated proper service of process on Amazing Love in keeping with D.C. law, allowing for the potential entry of default judgment.

**B.    The Complaint's Well-Pled Allegations Demonstrate Liability**

To prevail on a claim of FCA retaliation, 31 U.S.C. § 3730(h), Calliham needs to establish that: (1) "she engaged in protected activity" and (2) Amazing Love "retaliated against her because of that activity." *Singletary v. Howard Univ.*, 939 F.3d 287, 295 (D.C. Cir. 2019) (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)). On the first element, "protected activity" in this context encompasses "lawful measures to stop or avert what [an employee] reasonably believed would be a violation of the False Claims Act." *Id.* at 297. On the second element, Calliham needs to show that: (a) Amazing Love "knew she was engaged in protected activity" and (b) "the retaliation was motivated at least in part by her protected activity." *Id.* (citation and quotation marks omitted); *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 17 (D.D.C. 2015) ("[B]oiled down to its essentials, an FCA retaliation claim requires: (1) protected activity; (2) notice; and (3) adverse action taken in response to such protected activity.").

Calliham's allegations—which, again, are accepted as true by virtue of Amazing Love's default, *Crabtree*, 2024 WL 2864222, at *3—satisfy these elements. First, she raised internal complaints that "Amazing Love was billing to the government for services that it was not providing." (Compl. ¶ 1.) "In her review of case documentation, [she] realized that Amazing Love was billing Medicaid for … visits that had not occurred." (*Id.* ¶ 12.) She also reported concerns that "Amazing Love was upcoding," *i.e.*, "using billing codes that reflected more expensive services than those actually provided" to her supervisor and a program director, who in turn

---

a matter of practice—finds no grounding in the statute itself. Instead, as Judge Bates has explained, the work required after delivery to the Superintendent "is the Mayor's duty—the plaintiff's obligations are complete upon serving the Mayor's designee with a copy of the summons and complaint." *Robinson*, 10 F. Supp. 3d at 163–64; *see also SNH Med. Off. Properties Tr.*, 2020 WL 5834858, at *5 (similar).

reported them up the leadership chain. (*Id.* ¶¶ 13, 17–22.) Because her reports were aimed at stopping "fraud in connection with the submission of a claim for federal government funds," *Singletary*, 939 F.3d at 296, Calliham's actions qualify as "protected activity" under the statute, *Yesudian*, 153 F.3d at 741 n.9 ("[I]nternal reporting of false claims is itself an example of a protected activity[.]"). Second, because Calliham complained internally with management—who, in turn, escalated those reports up the leadership ladder—the very nature of her reports suffices to establish Amazing Love's notice of her activity. And third, Calliham's allegations show, in a non-conclusory fashion, that her termination was "motivated at least in part" by those reports. Indeed, during the termination meeting itself, an Amazing Love manager asked what Calliham "ha[s] against the company," reproached her for "causing trouble for the agency," and said she was being terminated for "creating discord in the workplace." (Compl. ¶¶ 25–28.) Those allegations suffice to show a causal link between Calliham's protected activity and her termination.

Because the well-pled allegations of the Complaint allow for a finding of liability against Amazing Love, the Court proceeds to evaluate the damages and other relief sought by Calliham.

### C.    Calliham's Requested Relief

The FCA allows for "all relief necessary to make [the] employee … whole," 31 U.S.C. § 3730(h)(1), and specifically provides for recovery in the form of "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees," *id.* § 3730(h)(2). Calliham seeks recovery across all these categories of relief. The Court addresses each in turn.

### 1.    Backpay

Calliham asks the Court to award a total of $258,944.32 in backpay—which she calculates as "2 times the amount of backpay" under Section 3730(h)(2). (ECF No. 24.) Calliham arrives at this amount using two overall inputs: her lost earnings and her replacement earnings.

Starting with her lost earnings, Calliham measures from March 13, 2020 (her last day with Amazing Love) through October 8, 2023 (the date she started working full-time in her current position). This timeframe encompasses 93.1 biweekly periods, which Calliham multiplies by $2,192.31—her biweekly pay at Amazing Love based on her $57,000 annual salary ($57,000 ÷ 26 biweekly periods = $2,192.31 per period). As such, Calliham calculates her total baseline lost earnings at $204,104.06 ($2,192.31 x 93.1), before accounting for any replacement earnings.

As for replacement earnings, Calliham's evidence and hearing testimony confirm she received earnings from four sources during the period captured above: (1) $9,250 from OneCare DC, Inc. between September and November 2020, plus another $32,686 between February and July 2021 (ECF Nos. 23-3, 23-4); (2) $15,244.50 from New Living Health Service, LLC between September and December 2021 (ECF No. 23-5); (3) $27,083.30 from Life Care, Inc. between February and July 2022 (ECF No. 23-6); and (4) $65,000 working for Prince George's County, Maryland in a temporary, one-year contractor position between July 2022 and June 2023 (ECF No. 23-7).[6] Combined, these amounts total $149,263.80 across that period.[7]

So those are the relevant inputs, and the undersigned is satisfied that Calliham provided a sufficient evidentiary basis for both. The next question becomes how to properly sequence those inputs when doubling a backpay award under the FCA. Specifically, should the Court double the lost earnings before deducting replacement earnings (which would yield the $258,944.32 total

---

[6] Along with the written exhibits substantiating these earnings, Calliham testified about these facts during the December 2024 hearing. A copy of the hearing transcript is on file with the undersigned's chambers.

[7] Calliham's original backpay calculations also deducted amounts she received as unemployment benefits: around $16,000 in 2020, plus another $6,300 or so in 2023. (*See* ECF No. 17.) But during the hearing, the Court asked whether those amounts should be excluded from any offset under the collateral-source doctrine, and Calliham now argues for that approach. (*See* ECF No. 24.) The undersigned agrees and recommends that Calliham's unemployment benefits not be offset against any backpay award. *See, e.g.*, *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 154–55 (D.D.C. 2016) ("[U]nemployment benefits should not be subtracted from back-pay in employment discrimination cases[.]") (collecting cases).

Calliham seeks), or should it deduct replacement earnings first and double only the remainder (which would yield a lesser total of $109,680.52)? Double then deduct, or deduct then double?

Calliham argues that *United States v. Bornstein*, 423 U.S. 303 (1976), compels the first approach—what she calls a "simple rule" of "multiply first, subtract second." (*See* ECF No. 24 at 3.) The undersigned disagrees. *Bornstein* involved a different (and now-superseded) provision of the FCA that provided for "doubl[ing] the amount of *damages*" the United States sustained as a result of fraud against the government. *Bornstein*, 423 U.S. at 307. Construing that statute, the Court held that "in computing the double damages … the Government's actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source." *Id.* at 316. The Court, in so reasoning, flagged that the statute spoke of "doubling 'damages' and not doubling 'net damages.'" *Id.* at 314 n.10. The text's use of the term "damages," in other words, was key to the Court's analysis.

Here, by contrast, the statute allows for recovery of "2 times the amount of *back pay*." 31 U.S.C. § 3730(h) (emphasis added). Backpay is generally viewed as an "equitable" remedy, *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (addressing backpay in Title VII context), that incorporates the concept of net loss by accounting for replacement earnings in the very definition of backpay, *see, e.g.*, *Kapche v. Holder*, 677 F.3d 454, 469–70 (D.C. Cir. 2012) (affirming denial of backpay award because plaintiff earned more in a new job than he would have earned in the lost job); *Schroer v. Billington*, 2009 WL 1543686, at *1 (D.D.C. Apr. 28, 2009) (outlining two approaches to calculate backpay—the "periodic mitigation method" and the "aggregate mitigation" method—both of which account for actual earnings during the relevant

period). In this way, by providing for doubling of *backpay*, not *damages*, the statute effectively speaks in terms of "net damages"—the very situation *Bornstein* said it was not addressing.[8]

At least one other district court has squarely distinguished *Bornstein* on these same grounds, going on to hold that Section 3730(h) is best construed by doubling lost earnings only *after* reducing for replacement earnings. *Miniex v. Houston Housing Auth.*, 2019 WL 1675857, at *2–3 (S.D. Tex. Apr. 17, 2019). The undersigned finds that analysis persuasive. And several other federal courts have construed this aspect of Section 3730(h)(2) in the same way, albeit without grappling with *Bornstein* as comprehensively. *Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 891–92 (8th Cir. 2000); *Wilkins v. St. Louis Housing Auth.*, 314 F.3d 927, 934 (8th Cir. 2002); *Harris v. Blue Ridge Health Servs.*, 388 F. Supp. 3d 633, 643–44 (M.D.N.C. June 21, 2019). As those courts reasoned, account for replacement earnings before doubling any backpay award more faithfully adheres to the statute's goal of providing "all relief necessary to make [an] employee … whole," 31 U.S.C. § 3730(h)(1), while avoiding "a windfall," *Hammond*, 218 F.3d at 892; *Harris*, 388 F. Supp. 3d at 644. The undersigned is aware of two district court cases—both of which Calliham cites (ECF No. 24 at 4)—that endorse the other approach. Neither persuades. *Neal v. Honeywell, Inc.* assumed without analysis that it should double lost earnings before deducting mitigation amounts. 995 F. Supp. 889, 896 (N.D. Ill. 1998). And *United States ex rel. Mooney v. Americare, Inc.* simply applied *Bornstein* to reach its conclusion, 172 F. Supp. 3d 644, 645-46 (E.D.N.Y. 2016), which the undersigned finds unavailing for the reasons explained.

---

[8] The cases Calliham cites from this District as "following *Bornstein*" for her preferred approach (ECF No. 24 at 3) are distinguishable for the same reason. They all construed the modern-day version of the statute at issue in *Bornstein*, now codified at 31 U.S.C. § 3729(a), which speaks of multiplying "the amount of *damages*" sustained by the government as a result of fraudulent claims. *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 501 F. Supp. 2d 51 (D.D.C. 2007); *United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158 (D.D.C. 2007) (same); *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108 (D.D.C. 2007) (same). None applied *Bornstein* to the distinct concept of "back pay" in Section 3730(h). The same holds true for Calliham's other footnoted cases to this effect. (ECF No. 24 at 3 n.3.)

As a final point to wrap up this part of the discussion, consider a practical exercise. Assume for the moment there was no basis to double backpay. In that scenario, based on the two inputs summarized above, Calliham's evidence would support a total backpay award of $54,842.26 (*i.e.*, $204,106.06 in lost earnings less $149,263.80 in replacement earnings). None of that should be in dispute. Now return to the world of doubling. Under Calliham's proposed double-then-deduct approach, the resulting backpay award would amount to nearly *five times* the baseline backpay just identified (approximately $259,000), whereas a deduct-then-double approach would yield an award that is exactly *two times* the baseline backpay (approximately $110,000). This exercise speaks volumes. Calliham's proposed approach would transform a statutory doubling provision into a statutory quintupling provision, and the Court simply cannot endorse that result.[9]

The undersigned thus recommends that the Court award Calliham backpay in the total amount of $109,680.52, which represents "2 times the amount of back pay" proven. § 3730(h)(2).

### 2.    Prejudgment Interest on the Backpay

Calliham asks the Court to award prejudgment interest "on her backpay damages." (ECF No. 23 at 6.) The statute provides for "interest on the backpay," 31 U.S.C. § 3730(h)(2), and the undersigned concludes that prejudgment interest would be appropriate here.[10] But Calliham requests prejudgment interest on the *doubled* backpay award. For the reasons just explained (*supra* § III.C.1), this approach is equally inconsistent with the statute and would produce an improper windfall. The courts to have squarely addressed this issue have held that "interest should be

---

[9] While certainly not dispositive, the Court observes that Calliham originally calculated backpay damages by doubling the amount of lost wage *after* accounting for mitigation earnings, and in a lesser amount, seeking a total backpay award of $63,434.66—after doubling. (*See* ECF No. 17.)

[10] Calliham originally requested prejudgment interest "on the total amount of the award." (ECF No. 17.) Because the statute's express terms allow for "interest on the back pay," rather than interest on all the categories of relief described in Section 3730(h)(2), Calliham appropriately narrowed her request.

calculated on the *undoubled back pay* less the other income." *Wilkins v. St. Louis Hous. Auth.*, 198

F. Supp. 2d 1080, 1090 (E.D. Mo. 2001) (emphasis added), *aff'd*, 314 F.3d 927 (8th Cir. 2002);

*Miniex*, 2019 WL 1675857, at *2 (similar); *Neal*, 995 F. Supp. at 897 (similar); *United States ex*

*rel. Howard v. Urban Inv. Trust, Inc.*, 2013 WL 4501422, at *4 (N.D. Ill. Aug. 22, 2013) (similar).

Calliham does not cite any cases to the contrary. The undersigned thus finds it appropriate to award

prejudgment interest only on the baseline backpay amount of $54,842.26.[11]

Turning to the appropriate interest rate, Calliham says the Court should use the rate

provided by 28 U.S.C. § 1961(a). (ECF No. 23 at 7.) Other district courts have used that rate for

purposes of calculating interest on backpay under Section 3730(h)(2). *Stewart v. Golden Victory*

*Med. LLC*, 2024 WL 1285920, at *8 (D. Minn. Mar. 26, 2024) ("The appropriate general standard

for the rate of prejudgment interest on an FCA plaintiff's back pay is the rate provided by 28 U.S.C.

§ 1961(a).") (cleaned up) (citing *Wilkins*, 198 F. Supp. 2d at 1090); *see also Thompson v. Quorum*

*Health Resources, LLC*, 2010 WL 2044542, at *9 (W.D. Ky. May 21, 2010) (using Treasury rates

in keeping with Section 1961(a)). This same approach would seem appropriate here.

But beyond generalities, Calliham fails to provide the Court with any calculations to

substantiate the amount of any prejudgment interest she seeks, let alone based on the proper

backpay amount that would be generating that interest ($54,842.26). And that analysis does not

strike the Court as obviously straightforward, especially given Calliham's request for

compounding interest and the apparent need to account for Calliham's various replacement

earnings at different steps of the overall calculations. Accordingly, at this juncture, the undersigned

recommends that the Court deny without prejudice Calliham's request for prejudgment interest,

---

[11] For what it's worth, this is also consistent with the legislative history. H.R. Rep. No. 99–660, at 23 (1986) ("It should be noted that the interest payable is to be calculated before the back pay is doubled."); *id.* at 32 (reiterating that "interest" is "to be paid on the singular amount of back pay due.").)

with leave to renew the request in a supplemental filing supported by specific calculations to

substantiate the amount of any prejudgment interest Calliham may seek.[12]

### 3. Compensatory Damages

Calliham next asks the Court to award compensatory damages associated with her

emotional pain and suffering. The statute allows for relief in the form of "compensation for any

special damages sustained as a result of the discrimination," 31 U.S.C. § 3730(h)(2), and courts

have held that this includes "recovery for emotional distress," *Gale v. Mission Hospice of San

Antonio, LLC*, 2023 WL 11915726, at *8 (W.D. Tex. July 11, 2023) (collecting cases).

Calliham's initial filing requested $2 million in compensatory damages (ECF No. 17)

without any supporting legal authority and with relatively sparse evidentiary support. None of

Calliham's supplemental filings filled in those gaps—they did not address Calliham's request for

compensatory damages for emotional distress at all. (*See* ECF Nos. 23, 24.) The Court held a

hearing in December 2024, however, during which it received testimony from Calliham about her

emotional-distress damages, and, based on that evidence, the undersigned finds that some award

of compensatory damages is appropriate. But there is simply no evidentiary or legal support in the

record for an award anywhere close to the $2 million in damages originally requested.

The valuation of compensatory damages is not susceptible to fixed rules or formulas. As a

starting point, though, "a plaintiff's own testimony is sufficient to establish emotional-distress

damages." *Hudson v. Am. Fed'n of Gov't Emps.*, 2021 WL 5083436, at *8 (D.D.C. Nov. 2, 2021),

---

[12] Other courts have taken a similar approach in past cases. *Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation, Pension & Welfare Funds v. Oneidaview Pile Driving Inc.*, 2016 WL 11481720, at *8 (E.D.N.Y. Feb. 5, 2016) (recommending denial of prejudgment interest subject to renewal supported by "appropriately detailed interest information and calculation"), *report and recommendation adopted sub nom. Trustees of Empire State Carpenters Annuity v. Oneidaview Pile Driving Inc.,* 2016 WL 2593927 (E.D.N.Y. May 4, 2016).

*aff'd*, 2022 WL 15798719 (D.C. Cir. Oct. 28, 2022). And "the factfinder may measure [the] plaintiff's testimony in light of the surrounding circumstances," considering "elements of compensable injury" that include "humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety and anguish." *Hobson v. Wilson*, 737 F.2d 1, 62 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993). At the hearing, Calliham testified about the emotional suffering she experienced following her employment termination and based on her overall experiences with Amazing Love more broadly. She described suffering from pronounced symptoms of anxiety, migraine headaches, and vertigo—all of which began near the time of her termination from Amazing Love. According to Calliham, she was prescribed medication to manage these conditions and symptoms, and she treated with a psychiatrist and a therapist for support. She also described the personal humiliation and sense of defeat associated she felt at being unable to financially and emotionally support herself and her family for the first time in her life.[13]

Based on firsthand and up-close observations of Calliham during the hearing, the undersigned found her testimony on these points to be credible and compelling. The evidence thus supports a nontrivial award of compensatory damages. But at the time same, the evidence likewise reflects that Calliham has made meaningful strides at improvement over the last few years, especially since returning to full-time work in late 2023. She is no longer taking medication to manage her anxiety, and her migraines have improved (but not resolved completely). And steady employment in a position she enjoys has improved her outlook overall. These latter points are all to Calliham's credit, but they counsel against a massive monetary award.

---

[13] As noted above, the hearing transcript is on file with chambers. And many of these same facts are captured in Calliham's November 2023 affidavit submitted with the default-judgment motion. (ECF No. 17.)

On balance, the undersigned recommends that the Court award Calliham compensatory damages in the amount of $100,000. This would be in keeping with damages awarded by other courts in cases involving reasonably similar facts. *See*, *e.g.*, *Dumpson v. Ade*, 2019 WL 3767171, at *7 (D.D.C. Aug. 9, 2019) (awarding $100,000 "for pain and suffering" where plaintiff "require[d] regular therapy and ha[d] been diagnosed with PTSD" and described other symptoms of "flashbacks, nightmares, depression, anxiety," and other symptoms); *Garcia v. Unit Dose Servs., LLC*, 2023 WL 6962827, at *4 (S.D. Fla. Oct. 2, 2023) (awarding $100,000 based on testimony that plaintiff "began to feel hopeless" and "anxious" after her employment termination, among other points), *report and recommendation adopted*, 2023 WL 6958658 (S.D. Fla. Oct. 20, 2023); *Joseph v. W. Linn Paper Co.*, 2020 WL 2462439, at *6 (D. Or. Apr. 24, 2020) (awarding $100,000 for emotional distress where plaintiff "could not pay his mortgage, could not support his family, and had to move in with his daughter" and testified about "sleeplessness, anxiety, and depression"), *report and recommendation adopted*, 2020 WL 2415678 (D. Or. May 12, 2020); *Reczek v. JHA Wilmington, Inc.,* 2008 WL 4723021 (D. Del. Oct. 27, 2008) (awarding $100,000 where plaintiff was prescribed medication to manage stress and anxiety and testified to broader feelings of embarrassment and depression). Admittedly, none of these cases is a perfect analogue to this one, but they nevertheless offer a reasonable—and reasonably recent—survey of how other courts have approached the valuation of emotional-distress damages in similar scenarios. Again, Calliham did not point to any caselaw or other authority that would justify the large seven-figure award of compensatory damages that she seeks here, or even anything close to it.

To borrow Judge Walton's words, the Court recognizes that "awarding noneconomic damages for pain, suffering, and mental anguish is necessarily an arbitrary endeavor to some degree." *Robinson v. Ergo Sols., LLC*, 4 F. Supp. 3d 171, 178–80 (D.D.C. 2014) (denying

$200,000 emotional-distress award on default judgment and awarding $20,000 instead). But in exercising its discretion to make that determination, the Court strived to carefully weigh the relevant considerations based on the facts and the law. The undersigned recommends an award of $100,000 in compensatory damages for Calliham's emotional pain and suffering.

### 4.    Litigation Costs and Attorneys' Fees

Calliham finally seeks litigation costs and attorneys' fees, which are likewise allowed by the statute. 31 U.S.C. § 3730(h)(2). The undersigned largely finds these requests to be proper.

On costs, Calliham seeks only $402 for her court-filing fees. This is a recoverable cost, Fed. R. Civ. P. 54(d)(1); 28 U.S.C. § 1920(1), and Calliham substantiates it with evidence (ECF No. 27-13), so the undersigned recommends awarding it.

Turning to fees, "[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 105 (D.D.C. 2015) (quoting *Blum v. Stenson,* 465 U.S. 886, 888 (1984)). The applicant "bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates[.]" *Covington v. Dist. of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995). This requires providing "sufficiently detailed information about the hours logged and the work done ... based on contemporaneous time records," *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982), and demonstrating that the requested hourly rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *Ventura*, 134 F. Supp. 3d at 105 (citing *Kattan by Thomas v. Dist. of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993)). Ultimately, courts evaluating the reasonableness of fees must make "a judgment call," *SNH Med. Off. Properties Tr.*, 2020 WL 5384858, at *9, and

are "obliged to exercise discretion in awarding attorney's fees when cases are resolved by default judgments," *Boland v. Yoccabel Const. Co.*, 293 F.R.D. 13, 20 (D.D.C. 2013).

Starting with the requested hourly rates, Calliham's counsel seeks reimbursement at the rates prescribed by the Fitzpatrick Matrix, which counsel attests to be the firm's "regular hourly rates." (ECF No. 23-11, A. Wilkenfeld Decl. ¶¶ 10–11.) The Fitzpatrick Matrix was developed by the United States Attorney's Office for the District of Columbia to model "prevailing market rates for complex federal litigation in the District of Columbia." *J.T. v. Dist. of Columbia*, 652 F. Supp. 3d 11, 16 (D.D.C. 2023). Since its debut a few years back, courts in this District have increasingly looked to the Fitzpatrick Matrix as an appropriate market barometer for fee requests in complex federal litigation. *Brackett v. Mayorkas*, 2023 WL 5094872, at *4–5 (D.D.C. Aug. 9, 2023) (collecting cases). Here, the requested hourly rates—which range from $500 to $838 per hour depending on the lawyer, as well as $236 per hour for paralegals—are right in line with the Fitzpatrick Matrix. And the rates are further substantiated by sworn declarations from Calliham's counsel. (ECF Nos. 23-11 through 23-16.) On this record, the requested rates are reasonable.

As for the hours expended, the Court has carefully reviewed the latest version of the billing entries submitted by Calliham's counsel (ECF Nos. 24-1, 24-2), which are broken out by both timekeeper and category of work. Those entries reflect the following: (1) approximately $12,000 incurred on pre-filing research and preparing the complaint; (2) approximately $7,000 incurred on service of process; (3) approximately $1,300 incurred on miscellaneous filings, including regarding the dismissal of certain defendants, notices of appearances, and *pro hac vice* filings; (4) approximately $20,000 incurred on motion-for-default filings between September 2023 and March 2024; (5) approximately $4,000 incurred to request, prepare for, and attend a status conference in September 2024; (6) approximately $21,000 incurred to prepare for the December 2024

evidentiary hearing, which includes preparing supplemental written submissions; (7) and approximately $25,000 incurred in preparing submissions after the evidentiary hearing. (*See* ECF No. 24-2.) All told, this amounts to approximately $90,000 in total fees across 143 hours.[14]

At a surface level, these totals seem somewhat out of step with the amount of time and expense one would expect to see for a case in which no defendant ever appeared. But the Court is mindful that its role is not to become some "'green-eyeshade accountant,' sequentially weighing the propriety of each entry listed in the movant's request," but rather to focus on the goal of "'rough justice.'" *Brackett*, 2023 WL 5094872, at *7 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). Except for one category of entries discussed next, the balance of counsel's entries reflect reasonable work, especially since the Court conducted an evidentiary hearing involving witness testimony and requested supplemental written submissions as part of the default-judgment process.

But the undersigned does recommend denying fees for counsel's work on the first two procedurally infirm motions for default judgment (ECF Nos. 8, 15), which the Court rejected for (i) failure to first seek entry of default and then (ii) failure to provide evidentiary support for the requested damages. (Min. Orders dated Aug. 1, 2023, Oct. 6, 2023.) Courts may reject fee claims for "excessive, redundant, or otherwise unnecessary charges," *Okla. Aerotronics, Inc. v. United States*, 943 F.2d 1344, 1347 (D.C. Cir. 1991), and Calliham's first two attempts at moving for default judgment fit that description, *see, e.g.*, *West v. Potter*, 2011 WL 13142098, at *6 (D.D.C. Dec. 1, 2011) (denying fees associated with unnecessary motions). To that end, in endeavoring to capture that component of time, the Court reviewed billing category captioned "Motion for Default" (ECF No. 24-2) and tabulated all entries that predate October 6, 2023—when the second

---

[14] Calliham's counsel did not separately seek an award of fees for time spent preparing the latest supplemental response addressing proper service of process on Amazing Love.

unsuccessful motion was denied—which total $10,535.60.[15] Subtracting that amount from Calliham's total requested fees of $89,199.90 (ECF No. 24 at 6), that leaves $78.664.30.

Accordingly, the undersigned recommends that the Court award Calliham $402 in recoverable costs and $78,644.30 in attorneys' fees.

## RECOMMENDATION

To sum up, the undersigned recommends that the Court **GRANT** Calliham's motion for default judgment (ECF No. 17) in substantial part and enter judgment in favor of Calliham and against Amazing Love as follows:

1. $109,680.52 in backpay (which includes doubling per Section 3730(h)(2));

2. $100,000.00 in compensatory damages; and

3. $402 in litigation costs and $78,644.30 in attorneys' fees.

Otherwise, the undersigned recommends that the Court **DENY WITHOUT PREJUDICE** prejudgment interest on the backpay award against Amazing Love, with leave to renew the request supported by specific calculations. And the undersigned recommends that the Court **DENY AS WITHDRAWN** Calliham's motion for default judgment against Ntemi altogether.

\*     \*     \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations

---

[15] More specifically, this amount encompasses the following subtotals broken out by timekeeper: $4,508.20 for Bilkis, $236 for Chhabra, $344.40 for Greer, and $5,447 for Wilkenfeld.

set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: March 14, 2025

_____
MATTHEW J. SHARBAUGH
United States Magistrate Judge